**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO. 15-24542-CIV-GOODMAN**

**[CONSENT CASE]**

RICHARD L. FOWLER, et al.,

     Plaintiffs,

v.

CALIBER HOME LOANS, INC., et al,

     Defendants.

_____ _____/

## <u>ORDER ON MOTIONS TO DISMISS</u>

*"I went to the fortune teller, Had my fortune read*

*I didn't know what to tell her/ I had a dizzy feeling in my head"*

-   The Rolling Stones, from the song, <u>Fortune Teller</u>[1]

Predicting the future is no easy task. It is therefore no surprise that people use different strategies to forecast what is likely to happen, with differing results. Some people use psychics, mediums, crystal balls, horoscopes or tea leaf readers. Weather forecasters use empirical data from myriad sources, supplemented by computer models. Cardiologists analyze blood samples to see if a patient is likely to have hypertension. Some blackjack gamblers use card-counting to determine whether the

---

[1]    Released on the "Got Live If You Want It!" album (London 1966).

next card the dealer turns over will cause a bust over 21 (and hope they don't get caught counting cards and get booted out of the casino). Seismologists try to measure how much strain accumulates along a fault to predict earthquakes. And then, of course, there are the classic fortune cookies which are often served for dessert in Chinese restaurants in the United States.

Courts, too, are sometimes in the prognostication business. Trial-level courts, for example, must predict how their appellate court would rule when there is no binding precedent on a specific legal issue. In this case, the Undersigned must predict how the Eleventh Circuit Court of Appeals would rule on a critical, case-dispositive issue raised in the motions to dismiss the class action lawsuit filed against an insurer (American Security Insurance Company) and a mortgage servicing firm (Caliber Home Loans, Inc.) in a force-placed insurance lawsuit.

Specifically, because the appellate court has not yet ruled, all parties agree that the Undersigned must predict whether the Eleventh Circuit would hold that the filed-rate doctrine applies to bar all eight of the counts asserted by Plaintiffs. Plaintiffs concede that all of the claims asserted in their Complaint would be subject to dismissal if the filed-rate doctrine applied here at the motion to dismiss stage.

Naturally, Plaintiffs contend that the filed-rate doctrine does not apply at all and they further argue that the doctrine should certainly not apply *now*, when the Court is evaluating the sufficiency of the Complaint as part of its assessment of the two motions

to dismiss.  Just as naturally, Defendants argue that the doctrine does apply (across the board and also at the pleadings evaluation stage) and should result in a with-prejudice dismissal of the Complaint.

Not only is there no Eleventh Circuit case on point, but the two federal appellate courts which have considered the issue appear to have adopted two diametrically opposed views.  The district courts in those two circuits have, as expected (and as required), followed the applicable precedent, with trial courts in the Second Circuit following *Rothstein v. Balboa In. Co.*, 794 F.3d 256 (2d Cir. 2015) and trial courts in the Third Circuit following *Alston v. Countrywide Fin. Corp.*, 585 F.3d 753 (3d Cir. 2009). Plaintiffs urge me to follow *Alston*; Defendants lobby for *Rothstein*. Each side argues that the appellate court opinion it relies upon is the better-reasoned, more-logical view.

But the question here is not whether the <u>Undersigned</u> selects *Alston* or *Rothstein* as the more-convincing, better-analyzed interpretation. Instead, the question is **what would the Eleventh Circuit Court of Appeals do?** That is a different question. *Cf. Molinos Valle Del Cibao, C. por A v. Lama*, 633 F.3d 1330, 1348 (11th Cir. 2011) (federal court must predict how the highest state court would decide the case when applying that state's substantive law and noting that decisions of intermediate state appellate courts provide data for the prediction and will generally be followed, unless persuasive evidence demonstrates that the highest state court would conclude otherwise).

The answer to this question (of what the Eleventh Circuit would do) necessarily involves a not-guaranteed forecast of what I surmise a higher-level court would decide if the issue were before it. The following exchange from the four-hour hearing on the motions to dismiss confirms the parties' view that I must predict how the Eleventh Circuit would rule:

> THE COURT:     All right. So there is no Eleventh Circuit case on point having to do with the filed-rate doctrine as it applies to force placed or lender placed. And therefore, does everybody agree that my job is to take out the [Ouija] board and predict what the Eleventh Circuit would do?[2]
>
> ALL COUNSEL: Yes.

[ECF No. 73, pp. 12-13].

Based on my review of the Eleventh Circuit's opinions in other cases not involving lender-placed insurance in which the filed-rate doctrine was asserted, I believe that our appellate court has firmly embraced the filed-rate doctrine and does not hesitate to invoke it when circumstances are appropriate. In fact, the Eleventh Circuit has noted that the doctrine is applied "strictly" to "prevent a plaintiff from bringing a

---

[2]     In a March 4, 2016 hearing before United States District Judge Kathleen M. Williams on Defendants' motions to dismiss in a similar force-placed class action case, one of Plaintiffs' attorneys -- who is also Plaintiffs' counsel here -- explained that "your Honor's job in today's hearing is going to be[,] **what would the Eleventh Circuit do**, and that's what a district court needs to do." *Beber v. Branch Banking & Trust Co., et al* No. 15-cv-23294, ECF No. 63, p. 47 (S.D. Fla. Mar. 11, 2016) (emphasis added). Judge Williams later (on June 21, 2016) denied the motions to dismiss as moot after granting a joint request to stay pending settlement and after Plaintiffs filed an amended complaint.

cause of action **even in the face of apparent inequities**[.]"[3] (emphasis added). In addition, I have considered whether there might be something about lender-placed insurance cases in general or the specific allegations made in this case which might cause the Eleventh Circuit to be leery about using the filed-rate doctrine here to prohibit the claims, but I have not found anything which would create a *de facto* immunity from the filed-rate doctrine which might exist in this Circuit.

For reasons outlined in greater detail below, I predict that the Eleventh Circuit would apply the filed-rate doctrine here, thereby precluding all eight counts and requiring the Undersigned to **grant** Defendants' motion and **dismiss** the Complaint **with prejudice**.

## Factual Background

This case is one of many putative class actions that have been filed around the country against various servicers and insurers regarding their lender-placed insurance (LPI) programs.[4]

Plaintiffs are borrowers with home loans serviced by Caliber Home Loans, Inc. ("Caliber"). Richard Fowler and Yvonne Yambo-Gonzalez are Florida residents who own separate properties in Miami-Dade County. [ECF No. 1, ¶¶ 13-14, 47-48, 64-65].

---

[3]      *Hill v. Bellsouth Telecommunications, Inc.*, 364 F.3d 1308, 1316 (11th Cir. 2004).

[4]      Plaintiffs often refer to the program as force-placed insurance. In the Class Action Complaint ("CAC"), for example, Plaintiffs here use that very term. [*See, e.g,* ECF No. 1, p. 2].

5

Glenda Keller is a Pennsylvania resident who owns real property in Lancaster, Pennsylvania. [*Id.*, at ¶¶ 15, 76-77].  Plaintiffs allege that Caliber colluded with its LPI insurer, American Security Insurance Company ("ASIC"), to charge them inflated LPI premiums that included "kickbacks" paid to Caliber and its affiliates.

**Plaintiffs' Mortgages**

Each Plaintiff's loan was secured by a mortgage that required the mortgagor to maintain insurance on the property and gives the lender or its assigns the right to purchase its own insurance if the borrower breaches that promise. [ECF No. 1, ¶¶ 48, 64, 77, Exs. A, B].  Specifically, the mortgage provided:

> **5.   Property Insurance.**   If Borrower fails to maintain coverage described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, **such coverage shall cover Lender, but might or might not protect Borrower**, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect.   Borrower acknowledges that the **cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained.**

[*Id.*, at ¶¶ 48, 64, 77, Ex. A, ¶ 5 (emphasis added), Ex. B, ¶ 5; *see also* ECF No. 22-1, ¶ 7].

**A.   Yambo-Gonzalez**

Caliber's predecessor, Vericrest Financial, first notified Yambo-Gonzalez of a lapse in her hazard and flood insurance in June 2009. [ECF Nos. 1, ¶ 49; 23-2, ¶ 7]. The letter warned that the cost of any LPI policy "**may be substantially higher**" than any

voluntary coverage and that "[a]ffiliates of Vericrest Financial, Inc. may **earn commissions or income** in conjunction with the placement of this coverage." [ECF No. 23-2, Ex. 1] (emphasis supplied). Yambo-Gonzalez did not respond to that letter or subsequent similar letters [*id.*, at ¶ 8, Ex. 2], and Caliber obtained one-year hazard and flood LPI policies from ASIC [*id.*, Ex. 3].

Since 2010, Caliber has sent Yambo-Gonzalez letters annually, reminding her of the lapse in coverage and advising it will renew the LPI hazard and flood policies for an additional one-year term if she fails to provide proof of coverage. [*Id.*, Exs. 5-16; ECF No. 1, ¶¶ 52, 54-56]. Yambo-Gonzalez has not provided proof of coverage in response to any of these letters. Caliber therefore renewed the hazard and flood policies each year. [ECF No. 1., ¶¶ 50, 52].

### B.    Fowler

Caliber sent Fowler a letter in May 2014, advising that it had no record of insurance on his property and requesting that he provide proof of coverage. [ECF No. 23-1, Ex. 1]. The letter disclosed, in boldfaced type, that the insurance Caliber would obtain "**[m]ay be more expensive than insurance you can buy yourself**[.]" *Id.*  Fowler did not provide proof of coverage in response to that letter or a follow-up letter [*id.* at Ex. 2], and Caliber therefore obtained an LPI policy from ASIC in June 2014 [*id.*, Ex. 3]. Caliber has since renewed the policy based on Fowler's failure to provide proof of voluntary coverage. [ECF No. 1, ¶ 66].

7

### C.    Keller

Caliber sent Keller a letter in March 2015, advising that it had no record of hazard insurance on her property and requesting she provide proof of coverage. [ECF Nos. 1, ¶ 78; 23-3, Ex. 1]. The letter contained the same disclosures warning of LPI's disadvantages that were made in the letter sent to Fowler. [*Id.*]. Keller did not provide proof of coverage in response to that letter or a similar follow-up letter. [*Id.*, Ex. 2]. As a result, Caliber obtained an LPI policy from ASIC in May 2015.  [*Id.*, Ex. 3]. Caliber has since renewed the policy based on Keller's failure to provide proof of voluntary coverage. [ECF No. 1, ¶ 66].

### THE COMPLAINT'S ALLEGATIONS AND CLAIMS

The CAC alleges that Caliber and ASIC have an arrangement under which ASIC performs "many of Caliber's mortgage-servicing functions and is the exclusive provider of [LPI] for . . . mortgage loans owned or serviced by Caliber." [ECF No. 1, ¶ 2]. In exchange, ASIC is alleged to pay Caliber "kickbacks," including one or more of the following: unearned commissions paid to a Caliber affiliate, "expense reimbursements" paid to Caliber for LPI placement expenses, reinsurance premiums that did not carry any transfer of risk, and below-cost mortgage servicing functions that ASIC performs for Caliber. [*Id.*, at ¶¶ 3, 26-28].

Plaintiffs' theory is that the alleged "kickbacks" provide Caliber with a "rebate on the cost of the force-placed insurance" which Caliber "do[es] not pass on . . . to the

borrower." [*Id.*, at ¶ 3]. Plaintiffs repeatedly complain about amounts *included in their LPI premiums,*[5] and seek **damages exactly equal to the portions of their LPI premiums they contend comprise the alleged "kickbacks.**" [*Id.*, at ¶¶ 6, 12, 25, 31, 34, 37, 45-46, 123-29, 134, 157-58] (emphasis added). Plaintiffs do not dispute they were charged only the exact LPI premiums authorized by state-approved rates.[6]

The CAC asserts four claims against ASIC: Count IV (unjust enrichment), Count V (tortious interference with a business relationship), Count VII (RICO violation of § 1962(c)), and Count VIII (RICO conspiracy). In addition, the CAC asserts six claims against Caliber: Count I (breach of contract), Count II (breach of implied covenant of good faith and fair dealing), Count III (unjust enrichment), Count VI (Truth in Lending Act violations), Count VII (substantive RICO) and Count VIII (RICO conspiracy). ASIC and Caliber have both moved to dismiss the Complaint with prejudice on grounds of

---

[5]      *See, e.g.,* ECF No. 1, ¶¶ 26 ("a percentage of borrowers' [LPI] charges are 'kicked back' . . . to Caliber"); 31 (same); 32 (the "kickback" "is an effective rebate on the premium amount"); 34 ("Caliber . . . charges the borrower the full, 'pre-rebate' amount for the coverage"); 35 (Caliber purchases LPI "with artificially inflated premiums"); 37 ("The full cost of the servicing activities are added into the force-placed amounts which are then passed on to the borrower.").

[6]      *See* the May 16, 2016 Hearing:

THE COURT:  So if you go down six lines, Fowler[,] Keller and Yambo-Gonzalez . . . paid the very rate approved by the regulator as applied to their specific properties.
So number one, I take it, you don't factually disagree with that, correct?

MR. MOSKOWITZ:  I'll take their word for it.

[ECF No. 74, p. 119].

the filed-rate doctrine. They also allege other pleadings defects, but the Undersigned need not address them because the filed-rate doctrine is sufficient to justify a with-prejudice dismissal of all eight counts.

THE PARTIES' DECLARATIONS (SUBMITTED IN THIS CASE)

In support of its Motion, ASIC submitted three declarations by Ronald K. Wilson -- one for each plaintiff -- and one by Rebecca H. Voyles. [ECF Nos. 23-1; 23-2; 23-3; 23-4]. Mr. Wilson's declarations include the LPI letters sent to the plaintiffs along with LPI insurance binders and policies. Ms. Voyles' declaration includes ASIC's Florida and Pennsylvania rate filings relevant to the LPI coverages issued to plaintiffs.

Plaintiffs have moved for leave to file a declaration of Mr. Birny Birnbaum, purportedly in response to the Wilson and Voyles declarations. Plaintiffs filed their motion for leave to file Birnbaum's declaration [ECF No. 58] on May 6, 2016. The declaration is dated March 25, 2016, however. Plaintiffs' counsel later explained, in the reply [ECF No. 66] filed in support of the motion seeking leave to file the Birnbaum declaration, that he filed the declaration in two other LPI cases pending in this district. He explained that he had not realized that the declaration had not been filed in this case until he began preparing for the motion to dismiss hearing and further noted that ASIC already reviewed and commented upon the same declaration in the two other cases in which it was filed. Therefore, Plaintiffs' counsel argued, undue delay should not be a reason to deny the motion for leave.  As explained below, however, *other* reasons, not

the timing issue, compel the Undersigned to deny the motion for leave to file Birnbaum's declaration.

As an initial matter, the Court addresses whether it can -- or should -- consider these declarations, or if it should consider only the documents attached to the pleadings.

In addition to considering the complaint's factual allegations, "[c]ourts may take judicial notice of publicly filed documents . . . at the Rule 12(b)(6) stage." *U.S. ex rel. Osheroff v. Humana Inc.*, 776 F.3d 805, 815 n. 4 (11th Cir. 2015) (citing Fed. R. Evid. 201(b)(2)). Also, under the "incorporation by reference" doctrine, "the district court may consider an extrinsic document if it is (1) central to the plaintiff's claim, and (2) its authenticity is not challenged." *SFM Holdings, Ltd. v. Banc of America Securities, LLC*, 600 F.3d 1334, 1337 (11th Cir. 2010).

Plaintiffs agree that the Court may take judicial notice of ASIC's rate filings. [ECF No. 74, pp. 45-47];[7] *see also Chinn v. PNC Bank, N.A.*, 451 F. App'x 859, 860 n.1 (11th Cir. 2012); *Armour v. Transamerica Life Ins. Co.*, 2012 WL 234032, *5 (D. Kan. Jan. 25, 2012) (taking judicial notice of rate filing with the department of insurance). Plaintiffs also agree the Court may consider the documents attached to the Wilson Declarations because the CAC includes those documents and because the documents are referred to

---

[7]    At the hearing, Plaintiffs' counsel explained that "[f]or judicial notice, the Court has wide discretion to take judicial notice of many publically available items. And, of course, it is **not reversible error whether you do or you don't."** (emphasis added) [ECF No. 74, p. 46].

and are central to the allegations and claims in the Complaint. [ECF No. 74, pp. 29-30];

*see also Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997).

Plaintiffs do not challenge the authenticity of the rate-filing documents and the LPI

notices attached to ASIC's declarations.

In *Patel v. Specialized Loan Servicing LLC*, No. 15–62600, 2016 WL 1663827 (S.D.

Fla. Apr. 25, 2016) and *Trevathan v. Select Portfolio Servicing, Inc.*, 142 F. Supp. 3d 1283

(S.D. Fla. 2015), District Judges Cohn and Dimitrouleas took "judicial notice of ASIC's

exhibits documenting OIR's approval of ASIC's premium rates in Florida, as these

documents are a matter of public record." 2016 WL 1663827, at *2; 142 F. Supp. 3d at

1287-88. This Court will likewise take judicial notice of ASIC's rate-filing documents

because they are public records. In addition, the Court will consider the LPI notices and

other documents attached to Mr. Wilson's declarations because these documents are

included in, and are central, to the claims asserted. [ECF No. 74, pp. 29-30]. But the

Court declines to consider Mr. Birnbaum's declaration, as it does not dispute the

authenticity of either the rate filings or the LPI notices, and is instead an attempt to

interject improper expert testimony into a Rule 12(b)(6) context.[8]

---

[8]     The Undersigned views the filed-rate doctrine argument as a merits-based
defense, rather than a challenge to the Court's subject matter jurisdiction or an issue of
standing. Therefore, the Court evaluates the dismissal motions under Federal Rule of
Civil Procedure 12(b)(6), not (b)(1). Thus, the Birnbaum declaration should not be
considered for 12(b)(1) purposes. The other documents, however, are properly
considered under a 12(b)(6) analysis. *Patel*, 2016 WL 1663827, at *2 (listing cases).

## Applicable Legal Standards and Analysis

### Motion to Dismiss Standard

In reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court must take all well-pleaded facts in the plaintiff's complaint and all reasonable inferences drawn from those facts as true. *Jackson v. Okaloosa Cnty., Fla.*, 21 F.3d 1531, 1534 (11th Cir. 1994). "A pleading must contain 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009) (quoting Fed. R. Civ. P. 8(a)(2)). While detailed factual allegations are not always necessary in order to prevent dismissal of a complaint, the allegations must "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

A complaint must provide "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Twombly,* 550 U.S. at 555. *See also Iqbal,* 556 U.S. at 678 (explaining that the Rule 8(a)(2) pleading standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation"). Nor can a complaint rest on "'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal,* 556 U.S. at 678 (quoting *Twombly,* 550 U.S. at 557 (alteration in original)).

The Supreme Court has emphasized that "[t]o survive a motion to dismiss a complaint must contain sufficient **factual** matter, accepted as true, to 'state a claim to

relief that is **plausible on its face**.'" *Iqbal*, 556 U.S. at 678. (quoting *Twombly*, 550 U.S. at 570) (emphasis added); *see also Am. Dental Assoc. v. Cigna Corp.*, 605 F.3d 1283, 1288–90 (11th Cir. 2010). "[C]onclusory allegations, unwarranted deductions of fact, or legal conclusions masquerading as facts will not prevent dismissal." *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002).

Determining whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. Moreover, when the "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not show[n]—that the pleader is entitled to relief." *Id.* (internal quotations omitted) (alteration in original).

While the court is required to accept as true all allegations contained in the complaint, courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555; *Iqbal*, 556 U.S. at 678. "Dismissal pursuant to Rule 12(b)(6) is not appropriate unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Magluta v. Samples*, 375 F.3d 1269, 1273 (11th Cir. 2004) (internal quotations omitted). Although, as noted, a court must accept as true a plaintiff's allegations, a court may dismiss a complaint on a dispositive issue of law. *Marshall Cnty. Bd. of Educ. v. Marshall Cnty. Gas Dist.*, 992 F.2d 1171, 1174 (11th Cir. 1993).

## The Filed-Rate Doctrine

Both ASIC and Caliber contend that the filed-rate doctrine bars all of Plaintiffs' claims here because the damages it seeks would effectively require an assessment of the regulator-approved rates. Plaintiffs do not dispute that such an evaluation would be necessary in order to pursue their claim. At the hearing, their counsel admitted that Plaintiffs **could not "calculate damages without determining the amount of the commissions, tracking expenses, or other allegedly inflated, or unearned portions, of the LPI premium."** [ECF No. 74, p. 105]. And there is no dispute that the Plaintiffs were in fact charged the very same premiums which the applicable state regulators approved in connection with ASIC's filed rates.

The Undersigned will address the filed-rate doctrine as follows: (1) I will first explain the filed-rate doctrine in general; (2) I will then discuss why it makes sense to address the issue *now*, at the pleadings stage; (3) I next will provide a comprehensive discussion of both *Rothstein* and *Alston*; and (4) I will analyze the filed-rate doctrine's applicability in this case, including a discussion of Plaintiffs' arguments about why the doctrine should not be applied here.

"Where the legislature has conferred power upon an administrative agency to determine the reasonableness of a rate, the rate-payer can claim no rate as a legal right that is other than the filed rate[.]" *Taffet v. S. Co.*, 967 F.2d 1483, 1494 (11th Cir. 1992) (quotation marks and citation omitted); *Square D Co. v. Niagara Frontier Tariff Bureau,*

*Inc.*, 476 U.S. 409, 416-17 (1986) (parties' rights defined by the filed rate "cannot be varied or enlarged by either contract or tort" of the regulated entity).

The doctrine bars **all** claims which would *effectively* result in a rate lower than the filed rate. *Fla. Mun. Power Agency v. Fla. Power & Light Co.*, 64 F.3d 614, 615 (11th Cir. 1995). "[E]ven if a claim does not directly attack the filed rate, an award of damages to the customer that would, in effect, result in a judicial determination of the reasonableness of that rate is prohibited under the filed rate doctrine." *Hill v. Bellsouth Telecomms. Inc.*, 364 F.3d 1308, 1317 (11th Cir. 2004).

"[T]wo companion principles lie at the core of the filed rate doctrine: first, that legislative bodies design agencies for the specific purpose of setting uniform rates, and second, that courts are not institutionally well suited to engage in retroactive rate setting." *Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17, 19 (2d Cir. 1994) (citation omitted). Under the "nonjusticiability" principle, the doctrine "preserve[s] the regulating agency's authority to determine the reasonableness of rates." *H.J., Inc. v. Nw. Bell Tel. Co.*, 954 F.2d 485, 488 (8th Cir. 1992). "This principle 'prevents more than judicial rate-setting; it precludes any judicial action which undermines agency rate-making authority.'" *Hill*, 364 F.3d at 1317 (quoting *Marcus v. AT&T Corp.*, 138 F.3d 46, 61 (2d Cir. 1998)). Under the "nondiscrimination" principle, the doctrine "insure[s] that the regulated entities charge only those rates that the agency has approved or been made aware of as the law may require." *H.J., Inc.*, 954 F.2d at 488.

16

"Based on these two principles, 'the doctrine is applied **strictly** to prevent a plaintiff from bringing a cause of action even in the face of apparent inequities whenever either the nondiscrimination strand or the nonjusticiability strand underlying the doctrine is implicated by the cause of action the plaintiff seeks to pursue.'" *Hill*, 364 F.3d at 1316 (quoting *Marcus*, 138 F.3d at 59) (emphasis added).

It is not a plaintiffs' legal theory, or the defendants' alleged conduct, or even fraud upon the regulator that controls whether the filed-rate doctrine applies. *See, e.g.*, *Taffet*, 967 F.2d at 1495.[9] It is instead "'the impact [a civil action] will have on agency procedures and rate determinations,' rather than the defendant's underlying conduct, [that] controls whether the filed rate doctrine applies." *Taffet*, 967 F.2d at 1495 (citing approvingly to *H.J. Inc.*, 954 F.2d at 489).

ASIC's counsel did not shy away from the strong and wide net cast when the filed-rate doctrine applies. In fact, at the hearing, counsel, in response to a question from the Court, explained that the filed-rate doctrine would still apply even if the rate for the force-placed insurance was the result of a bribe paid to an insurance regulator

---

[9]     *See also Coll v. First Am. Title Ins. Co.*, 642 F.3d 876, 890 (10th Cir. 2011) (it is not defendant's "underlying conduct . . . [that] control[s] whether the filed rate doctrine applies.  Rather, the focus for determining whether the filed rate doctrine applies is the impact the court's decision will have on agency procedures and rate determinations.") (internal quotation marks and citation omitted); *Wegoland*, 27 F.3d at 20 ("every court that has considered the . . . argument has rejected the notion that there is a fraud exception to the filed rate doctrine;" collecting cases, including *Taffet*, 967 F.2d at 1494-95).

(or corruption, a conflict of interest, pure negligence, or a mistake. [ECF No. 74, p. 60-61]. In confirming that this was ASIC's view of the filed-rate doctrine, counsel cited *Wegoland* and *Taffet*.

In *Taffet*, the Eleventh Circuit held that the filed-rate doctrine barred a RICO action filed by utility customers, in which the utility allegedly obtained approval of rates through fraud. The customers alleged that the utilities, in a conspiracy with their accounting firm, understated their net income in rate applications to their state public service commissions by improperly accounting for purchases of spare parts, thereby obtaining rate increases through fraud. Explaining that a rule allowing consumers to recover damages for "fraudulent" rates would "disrupt greatly the states' regulatory schemes" and "in the end," would "cost consumers dearly," the Eleventh Circuit held that there was no fraud exception to the filed-rate doctrine. 967 F.2d at 1491, 1494-95.

**Applying the Doctrine at the Pleadings Stage**

A preliminary question is whether the Court may decide the filed-rate doctrine's application on the pleadings, at the motion-to-dismiss stage. Addressing the doctrine at this stage is not unusual. In fact, in at least four cases, the Eleventh Circuit has held the filed-rate doctrine bars claims at the pleadings stage. *See Pfeil v. Sprint Nextel Corp.*, 284 F. App'x 640, 643 (11th Cir. 2008); *Hill*, 364 F.3d at 1317; *In re Olympia Holding Corp.*, 88 F.3d 952, 962 (11th Cir. 1996); *Taffet*, 967 F.2d at 1495. On each of those occasions, the plaintiffs denied that they were challenging the filed rate itself, arguing that they were

challenging only defendant's alleged fraud or other misconduct. *See, e.g., Hill,* 364 F.3d at 1317 ("Hill, for example, argues that her remaining claims do not directly challenge BellSouth's filed FUSF, but instead challenge BellSouth's *representation* of the FUSF to its customers."). But the Eleventh Circuit did not accept those descriptions at face value -- it analyzed plaintiffs' characterizations itself when rejecting claims under the filed- rate doctrine at the pleadings stage.

Moreover, two district courts in the Southern District of Florida have also recently granted motions to dismiss based on the filed-rate doctrine in cases nearly identical to this one.  *See Patel,* 2016 WL 1663827, at *2; *Trevathan,* 2015 WL 6913144, at *2.  The filed-rate doctrine arguments raised by the parties in *Patel* and the instant case are virtually identical, and the Undersigned notes that Plaintiffs' counsel and counsel for ASIC are the same in both cases. *Patel* relied heavily on *Rothstein*, and the Undersigned notes that ASIC's counsel in this case also filed an *amicus curiae* brief for ASIC in *Rothstein*, where the appellate court reversed a district court's order denying a motion to dismiss.

While the Undersigned has been hesitant to substantively rule on the filed-rate doctrine during the pleadings stage in past LPI cases,[10] there does not appear to be any

---

[10]     In *Montoya v. PNC Bank, N.A.,* 94 F. Supp. 3d 1293, 1320-22 (S.D. Fla. 2015), a pre-*Rothstein* case, I did not then substantively rule on the applicability of the doctrine. Instead, I emphasized that the filed-rate doctrine was being asserted in a motion to dismiss and expressly noted that Defendants could raise the argument again (and pointed out that the issue would need to be confronted when analyzing the not-yet-filed

valid reason to wait to decide the issue in this case, now that an appellate court has weighed in with a detailed analysis. Courts in similar LPI cases that previously had been reluctant to address the filed-rate doctrine on a motion to dismiss have ultimately addressed the issue later in the case because the plaintiffs' claims do allege that portions of the filed rates were excessive.

For example, in *Kunzelmann v. Wells Fargo Bank, N.A.*, No. 9:11-cv-81373, 2012 WL 2003337, at *2-3 (S.D. Fla. June 4, 2012), the Court initially denied defendants' motion to dismiss, accepting plaintiffs' argument that they were not challenging the filed rates. However, after plaintiffs' counsel explained their damage model later in the case, the Court realized the argument the plaintiffs advanced on the pleadings was incorrect and concluded that "the filed-rate doctrine is an issue that must be addressed." *Kunzelmann v. Wells Fargo Bank, N.A.*, 2013 WL 139913, at *12 (S.D. Fla. Jan. 10, 2013). The Court there concluded that differences between the states in their application of the filed-rate doctrine render certification of a nationwide class improper. The implicit point in this conclusion, however, is that the filed-rate doctrine would in fact apply. If the *Kunzelman* Court had decided that the doctrine did not apply at all, then the differences between the states would have been irrelevant.

In addition, Plaintiffs' counsel agreed at the hearing on the motion to dismiss in the instant case that the Court may decide whether or not the filed-rate doctrine applies

---

class certification motion). I likewise observed that I might also need to grapple with the filed-rate doctrine again if Defendants asserted it in a summary judgment motion.

on this motion. [ECF No. 74, pp. 79-81]. In light of plaintiffs' concession[11] and after considering the authority above, the Court will address the merits of Defendants' filed-rate doctrine argument.[12]

## _Rothstein_ and _Alston_

As noted above, two different circuit courts (the Second and the Third) have issued opinions on whether the filed-rate doctrine should be applied to bar force-placed insurance cases.

In _Alston_, the plaintiffs challenged the payment of kickbacks in connection with a reinsurance scheme related to private mortgage insurance ("PMI"). 585 F.3d at 757-

---

[11]    At the hearing, the Undersigned asked Plaintiffs' counsel, "assuming that I agree with the Defendants on the applicability of the filed-rate doctrine, is there any reason why I must defer the application of the doctrine to a later stage of this litigation, such as summary judgment?" Plaintiff's counsel succinct, to-the-point  response: "The answer is no." He then elaborated by saying, "If Your Honor finds, like Judge Cohn, that the doctrine applies, you can dismiss this case. Absolutely." [ECF No. 74, p. 80].

Counsel's reference to Judge Cohn is a reference to _Patel,_ which Judge Cohn recently decided (and granted a motion to dismiss). Plaintiffs' counsel asks that the Undersigned not follow _Patel_ for several reasons, one of which is the absence of oral argument or a hearing on the dismissal motion which Judge Cohn granted. But the docket sheet in _Patel_ does not reflect a motion or request for oral argument. Local Rule 7.1(b)(2) provides that "a party who desires oral argument or a hearing of any motion shall request it within the motion or opposing memorandum in a separate section titled "request for hearing." Plaintiffs' opposing memoranda to the two dismissal motions in _Patel_ do not include a section with the required section, and a review of the memoranda itself did not locate a request buried within the legal argument either.

[12]    At the hearing, all parties also urged the Undersigned to **not** postpone a ruling on the motions to dismiss until the Eleventh Circuit issues its opinion in the _Patel_ appeal, which Plaintiffs' counsel explained will primarily challenge the filed-rate doctrine. [ECF No. 74, pp. 39-44].

21

58. The plaintiffs argued that the filed-rate doctrine did not bar their claims because they had "challenged the payment of kickbacks, not the rates paid for PMI." *Id.* at 764. The court concluded: "It is absolutely clear that the filed rate doctrine simply does not apply here.  Plaintiffs challenge Countrywide's allegedly wrongful conduct, not the reasonableness or propriety of the rate that triggered that conduct." *Id.* at 765.

District courts in the Third Circuit have followed this reasoning in holding that the filed-rate doctrine does not apply to claims like those pled here.  *See, e.g., Laffan v. Santander Bank, N.A.* No. 13-cv-4040, 2014 U.S. Dist. LEXIS 79915, at *7-10 (E.D. Pa. June 12, 2014) (discussing *Alston* and concluding that doctrine did not apply because plaintiff was challenging the manner and methods used by Defendant in purchasing force-placed insurance); *Lauren v. PNC Bank, N.A.,* No. 2:13–cv–762, 2013 WL 5565511, at *5 (W.D. Pa. Oct. 8, 2013) ("In *Alston*, the Court of Appeals for the Third Circuit recognized the distinction between wrongful conduct and rate challenges and held that wrongful conduct claims were not barred by the filed rate doctrine."); *Gallo v. PHH Mortg. Corp.,* 916 F. Supp. 2d 537, 544 (D.N.J. 2012) (quoting *Alston* for proposition that "'the filed rate doctrine simply does not apply' in circumstances where plaintiffs 'challenge the defendant's allegedly wrongful conduct, not the reasonableness or propriety of the rate that triggered the conduct'").

Defendants note that *Alston* involved only a claim for statutory treble damages under section 8(d)(2) of the Real Estate Settlement Procedures Act of 1974 ("RESPA"),

a statutory claim not advanced here. In addition, they underscore the fact that the Third Circuit's filed-rate doctrine is relatively truncated and begins with the introduction that the "final issue" of the filed-rate doctrine would be "briefly address[ed]." Defendants also contend that *Alston* is technically not in conflict with *Rothstein (*because of these distinctions) and is merely inapposite.

Unlike *Alston*, the *Rothstein* Court issued an opinion containing an **extensive** discussion of the filed-rate doctrine, including the policy reasons underlying it and a discussion of why the plaintiff's arguments against the doctrine's applicability are unpersuasive. Also, unlike *Alston*, the *Rothstein* opinion arose from LPI scenarios -- the same fact pattern at issue here. The Undersigned will therefore provide a comprehensive discussion of *Rothstein*, including a point-by-point list of the more-important conclusions.

The *Rothstein* plaintiffs are borrowers who did not purchase hazard insurance on their mortgaged properties, in violation of their loan agreements.  Their loan servicer bought LPI from two insurance companies at rates that were approved by regulators. The servicer then sought reimbursement from the plaintiffs at those same rates.

The plaintiffs alleged that they were fraudulently overbilled because the rates their servicer charged them did not reflect secret "rebates" and "kickbacks" that the servicer received from an insurer through one of the insurer's affiliates. The plaintiffs pursued claims under RICO and RESPA. The servicer and its affiliate moved to

dismiss under the filed-rate doctrine. The district court denied the motion in relevant part, reasoning that the insurer received approval for the rates charged to the lender but that the approval did not necessarily extend to the borrowers' reimbursement to the servicer. Noting a conflict, the district court certified its decision for interlocutory appeal.

The Second Circuit held in *Rothstein* that a claim challenging a regulator-approved rate is subject to the filed-rate doctrine regardless of whether the rate is passed through an intermediary. Therefore, the Court held, a claim is "barred if it would undermine the regulator's rate-setting authority or operate to give the suing ratepayer a preferential rate." 794 F.3d at 259. The Court held that the plaintiffs' claims were barred and therefore reversed and remanded for dismissal of the case. *Id.*

According to the second amended complaint in *Rothstein*, the alleged scheme was that the servicer agreed to buy LPI exclusively from one insurer, who, in return, agreed to provide the servicer with loan tracking services through an affiliate. The services performed by the affiliate offset the servicer's expenses by relieving it of the obligation to do those things itself. Because the insurer provided the affiliate's services as a *quid pro quo* for the servicer's LPI business, the plaintiffs branded the affiliate's services as, in effect, a discount on LPI from the filed rates approved by regulators. And because the servicer still billed the plaintiffs at the approved, filed rates, it retained for itself the entire benefit of the discount.

The second amended complaint in *Rothstein* alleged substantive and conspiracy claims under RICO based on predicate acts of wire fraud, mail fraud and extortion, as well as a RESPA claim. The district court concluded that the filed-rate doctrine did not apply because the plaintiffs were not direct customers of the rate filer (the insurer). Nevertheless, it observed that the issue was "a close call," and the Second Circuit then tackled the issue on interlocutory appeal.

The *Rothstein* Court made the following important points in its appellate ruling:

1.      Under the filed-rate doctrine, "any" filed rate -- one approved by the governing regulatory agency -- is "per se reasonable and unassailable in judicial proceedings brought by the ratepayers." 794 F.3d at 261.

2.      The filed-rate doctrine is grounded on two rationales: the nonjusticiability principle (i.e., courts should not "undermine agency rate-making authority" by "upsetting approved rates") and the nondiscrimination principle (i.e., litigation should not become a means for certain ratepayers to obtain preferential rates). *Id.*

3.      The doctrine reaches both federal and state causes of action and protects rates approved by federal or state regulators.  *Id.*

4.      The doctrine does not depend on the nature of the cause of action or the culpability of the defendant's conduct "or the possibility of inequitable results." Instead, the ratepayer's claim is barred if it would offend either the nonjusticiabiity principle or the nondiscrimination principle. *Id.* at 262.

5.      A "claim may be barred under the nonjusticiability principle **even if it can be categorized as challenging something other than the rate itself**." *Id.* (emphasis supplied).

6.     Plaintiffs' claims would undermine the rate-making authority of the state insurance regulators who approved the carrier's rates because the Plaintiffs' theory -- they were overbilled when they were charged the full LPI rates approved by regulators, instead of the lower rates net of the value of loan tracking services provided by the affiliate -- "can succeed only if the arrangements with [the affiliate] should have been treated as part and parcel of the LPI transaction *and reflected in the LPI* rates." *Id.* (emphasis by the Court).

7.     Under the nonjusticiability principle, "it is squarely for the regulators to say what should or should not be included in a filed rate." *Id.*

8.     The Court rejected the argument that the filed-rate doctrine did not bar the claims because Plaintiffs said they were attacking the fraudulent scheme, not the rates themselves.

9.     Any attempt to determine what part of the rate approved by the regulators was a result of the fraudulent acts "would require determining what rate would have been deemed reasonable absent the fraudulent acts, and then finding the difference between the two." *Id.* at 262-63.

10.     The question of whether insurer-provided services should have been reflected in the calculation of LPI "is not for us to say" because the nonjusticiability principles mandates that "the question is reserved exclusively to the regulators." *Id.* at 263.

11.     Judicial endorsement of Plaintiffs' claims "would displace and distort the regulatory process," which means that "Plaintiffs' claims invite judicial meddling in issues of insurance policy"" -- a result "forbidden under the principle of nonjusticiability." *Id.*

12.     The nondiscrimination principle, like the nonjusticiability principle, applies "even to claims that purport to seek relief other than a lower rate." *Id.*

13.     Any damages recovered by the plaintiffs would operate as a rebate giving them a preference over other borrowers who were charged the full LPI rate. *Id.*

14.     Non-suing borrowers would be billed at the filed LPI rates, while the plaintiffs would enjoy the discount that the affiliate allegedly provided to the servicer, and "the problem is not obviated simply because Plaintiffs have brought their claims on behalf of a putative class." *Id.*

15.     The district court did not undertake the usual analysis under the nonjusticiability and nondiscrimination principles. Instead, it held that the filed-rate doctrine did not apply at all because it addresses only a simple A-to-B transaction "in which A, the insurer, approved a rate and charged it to B, not the A-to-B-to-C arrangement at issue here, in which the insurer billed the lender and the lender in turn billed the borrower." *Id.* at 264.

16.     "The filed rate doctrine is not limited to transactions in which the ratepayers deals directly with the rate filer." Instead, "the doctrine operates notwithstanding an intermediary that passes along the rate." *Id.*

17.     There is no "evident reason why the doctrine should be limited to direct transactions between the rate payer and the rate filer" because the two principles "have undiminished force even when the rate has passed through an intermediary." *Id.*

18.     Focusing on policy reasons and practical, common sense concerns, a court is "confronted with a single case, whereas a regulator can 'consider the whole picture' and 'make hundreds if not thousands of discretionary decisions' about overall industry regulation." 794 F.3d at 264-65.

19.     In many industries, including the LPI industry, the "rate-regulated product necessarily passes through intermediaries before the rate is paid by the ultimate consumer." In these industries, it would "make little sense" for the doctrine to apply "as between the rate filer and the intermediaries, but not when it comes to the ultimate ratepayers." 794 F.3d at 265.

20.     The distinction between an "A-to-B" transaction and an "A-to-B-to-C" transaction "is especially immaterial in the LPI context because LPI travels invariably "A-to-B-to-C." *Id.*

21.     LPI is "an A-to-B-to-C transaction that implements a two-party transaction between the insurer and the borrower." *Id.*

22.     The state insurance regulators were well aware that the approved LPI rates would be "fully born by borrowers," which means the "quintessentially 'A-to-B-to-C' character of LPI transactions was known to the regulators who approved" [the insurer's] rates." 794 F.3d at 266.[13]

### Would the Eleventh Circuit Apply the Filed-Rate Doctrine Here?

"The State of Florida heavily regulates the insurance industry." *Gilchrist v. State*

*Farm Mut. Auto. Ins. Co.*, 390 F.3d 1327, 1334 (11th Cir. 2004) (footnote omitted). The

---

[13]     The regulators in the instant case understand that the filed and approved rates for LPI will be passed on to borrowers. In fact, the OIR's website states that homeowners may be responsible for paying the LPI rates. [ECF No. 74, pp. 47-50]. Specifically, on its official website, the Florida Office of Insurance Regulation states: "The premium cost for this insurance is usually higher than conventional homeowners' premium, and this cost may ultimately be borne by the homeowner. The high premium costs and the fact that homeowners are often 'forced' to pay for this coverage by the lender (mortgage lender/bank) has increased the attention for this type of insurance." Fla. Office of Ins. Reg., "Lender-Placed Insurance Coverage" (last visited July 5, 2016), at http://www.floir.com/Sections/PandC/lenderplacedincoverage.aspx.

Insurance Code provides that insurers "must" file "cop[ies] of rates, rating schedules, rating manuals, premium credits or discount schedules, and surcharge schedules, and changes thereto" with the Office of Insurance Regulation. Fla. Stat. § 627.062(2)(a). "Upon receiving a rate filing, the [OIR] shall review the filing to determine if a rate is excessive . . . ," in light of accepted and reasonable actual techniques and considering 14 specified factors. Fla. Stat. § 627.062(2)(b). If the OIR finds the rate excessive, "the office shall initiate proceedings to disapprove the rate and shall so notify the insurer." Fla. Stat. § 627.062(2)(g).

Pennsylvania also heavily regulates the insurance industry. Insurers "shall file every manual of classifications, rules and rates, every rating plan and every modification of a manual of classifications, rules and rates and a rating plan which it proposes to use in this Commonwealth." 40 Pa. Stat. § 710-6(a). The Insurance Commissioner may disapprove rates that "are determined to be excessive, inadequate or unfairly discriminatory." 40 Pa. Stat. § 710-7(b). The Commissioner may disapprove or suspend previously approved rates if it subsequently determines the rates are excessive or otherwise contrary to law. 40 Pa. Stat. § 710-11(a)-(e).

As explained more fully in ASIC's motion to dismiss (*see* Declaration of Rebecca Voyles, ¶¶ 4-17, Exs. A-I) [ECF No. 23-4], ASIC filed its LPI rates for the policies at issue in this case in both Florida and Pennsylvania. The Florida OIR and Pennsylvania Department of Insurance approved the rates. *See id.* Plaintiffs do not challenge this.

29

In *Hill*, the Eleventh Circuit provided a road-map for analyzing filed-rate cases. The Court did not have any "binding, on-point precedent" for applying the doctrine but fulfilled its judicial function through "consideration of persuasive authority and the two broader principles underlying the doctrine: nondiscrimination and nonjusticiability." 364 F.3d at 1315. The Court turned to cases from other courts of appeals which had "considered the effect of the filed rate doctrine on claims similar to Hill's," and followed the analysis of these courts in concluding that the claims at issue were barred under the doctrine. *Id.* at 1315-16.

Applying the analytical template set forth in *Hill*, this Court predicts that the Eleventh Circuit would decline to follow *Alston*, which concerned whether RESPA's section 8 "created a private right of action without requiring an overcharge allegation." 585 F.3d at 755 (also stating, "[t]he focus of our attention in this appeal is RESPA section 8"); *see also Hazewood v. Found. Fin. Grp.*, 551 F.3d 1223 (11th Cir. 2008). The *Alston* defendant raised the filed-rate doctrine, 585 F.3d at 757, but the Court's analysis focused on the statutory interpretation of the relevant RESPA provisions. *Id.* at 761, 759-62.

As noted earlier, *Alston* also "briefly" addressed defendant's filed-rate argument, concluding that the doctrine "d[id] not apply" because "the measure of damages [under RESPA] is three times the price of PMI, no matter the price, so there is no need to parse or second guess the rates." *Id.* at 764. The court did not make any reference to the nonjusticiability and nondiscrimination principles, the touchstones of *Hill*'s analysis.

It is not *Alston* itself, but some district courts within the Third Circuit, that extended *Alston* to LPI cases. *See Patel*, 2016 WL 1663827, at *4. *Alston* did not involve LPI claims similar to those in the CAC, and *Alston* has no analysis of the nonjusticiability and nondiscrimination principles, and I believe that the Eleventh Circuit would not find *Alston* to be persuasive authority for the filed-rate issue here.

This prediction is confirmed by the Third Circuit's filed-rate case law, which adopts and conducts the same analysis of nonjusticiability and nondiscrimination as the Second Circuit in *Rothstein, Marcus* and *Wegoland. See, e.g., In re N.J. Title Ins. Litig.*, 683 F.3d 451, 455-58 (3d Cir. 2012) (relying on *Marcus* and *Wegoland* to affirm the dismissal of antitrust price fixing claims against numerous New Jersey title insurance companies, and adopting the Second Circuit's "expla[nation] that the [filed-rate] doctrine is designed to advance two 'companion principles': . . . 'nondiscrimination' . . . and . . . 'nonjusticiability[.]'").

It is apparent from *N.J. Title Ins. Litig.* that when the Third Circuit faces a true filed-rate issue, it undertakes a detailed analysis of nonjusticiability and nondiscrimination exactly like the Second Circuit did in *Rothstein*. Thus, I predict that the Eleventh Circuit would conclude that *Alston* is not persuasive, or, if somewhat persuasive, is not as helpful as *Rothstein*.

Application of *Hill's* analytical principles clearly counsels that this Court adopt the predicted evaluation of the Eleventh Circuit and follow *Rothstein*. In *Hill*, the

Eleventh Circuit expressly noted that the filed-rate doctrine is applied "strictly," even "in the face of apparent inequities," whenever either strand underlying the doctrine is implicated. This is a powerful indicator of the Eleventh Circuit's view of the filed-rate doctrine.

Moreover, not only is *Rothstein* a materially identical LPI case (in which ASIC filed a successful *amicus* brief), but it also undertook a detailed analysis of nondiscrimination and nonjusticiability  in the context of LPI claims and allegations **similar to those in this case.**  794 F.3d at 262.

Following *Rothstein*, other courts in this district evaluated the broad principles of nonjusticiability and nondiscrimination as applied to plaintiffs' claims and allegations in the LPI context.  *See Patel*, 2016 WL 1663827, at *4 (declining to follow *Alston* in virtually identical LPI case and instead following *Rothstein); Trevathan*, 142 F. Supp. 3d at 1287 (following the framework for filed-rate analysis laid out in *Hill*). This authority lends additional support to the prediction that the Eleventh Circuit would follow *Rothstein*, as opposed to *Alston.*

Defendants contend that there is no split of authority between *Alston* and *Rothstein,* but I reject that argument, as have other courts confronted with the *Alston/Rothstein* dichotomy. For example, in *Lyons v. Litton Loan Servicing LP,* No. 1:13-cv-513, 2016 WL 415165, at *13 (S.D.N.Y. 415165 Feb. 2, 2016), the court noted that a Third Circuit district court recently noted that "*Rothstein* is in direct tension with the

prevailing precedent in the Third Circuit, *Alston.*" So there is a split, but, as outlined above, I predict that the Eleventh Circuit would find *Rothstein* more persuasive and would follow its holding.

*Rothstein* considered only claims against the insurer and the insurer's affiliate, as the claims against the loan servicer had already settled.  In the instant case, Plaintiffs assert claims against the insurer and the servicer, but *Trevathan* and *Patel* extended *Rothstein's* reasoning to the servicer, as "failing to do so would contravene the purposes of the filed-rate doctrine." *Trevathan*, 2015 WL 6913144, at *3. The Undersigned does not see any logical reason to limit *Rothstein* to insurers and their affiliates and not apply it to the servicers, who charged the homeowners the precise premium they paid (after the appropriate state regulators approved it). Consequently, I predict the Eleventh Circuit would apply the filed-rate doctrine to loan servicers, as well.

Although the Eleventh Circuit has not yet ruled on the whether the filed-rate doctrine applies to LPI cases, it has issued a relatively recent opinion in a force-placed flood insurance case. *See Feaz v. Wells Fargo Bank, N.A.*, 745 F.3d 1098 (11th Cir. 2014). In *Feaz*, a borrower brought an action against her mortgage lender, alleging that it breached the mortgage-loan contract and violated extracontractual duties by requiring her to have more flood insurance than the amount established by federal law. Plaintiff alleged, in her breach of fiduciary duty claim under Alabama law, that Wells Fargo violated its fiduciary duty and committed fraud by charging her a commission, a

"kickback" or "other compensation" -- any amount above the net cost to Wells Fargo of obtaining the force-placed insurance.

Although the *Feaz* court had no need to analyze the filed-rate doctrine, it affirmed the district court's dismissal on other grounds, noting that Wells Fargo disclosed that Feaz would incur higher costs if it force-placed the flood insurance for her and agreeing that "simply calling a commission a kickback doesn't make it one." 745 F.3d at 1110-11. Given this ruling, it does not appear that the Eleventh Circuit would somehow view an LPI case differently from the other cases in which it applied the filed-rate doctrine to prevent claims. In fact, in other LPI cases, Defendant ASIC has argued that *Feaz* is dispositive and precludes the claims. Nevertheless, notwithstanding Defendants' broad view of *Feaz's* applicability, the Undersigned perceives nothing in that LPI case to suggest that the Eleventh Circuit would carve out LPI cases from its precedents concerning the filed-rate doctrine.[14]

Having predicted that the Eleventh Circuit would follow *Rothstein,* I need to determine whether *Rothstein's* interpretation of the filed rate doctrine would preclude

---

[14]     The Undersigned realizes that Plaintiffs have cited district court cases from the Third Circuit to support their view that *Alston*, not *Rothstein*, would be the law in the Eleventh Circuit, including at least one case which followed *Alston* not only because it is precedent which must be followed but also because the district judge found it "is the more sound application." *Burroughs v. PHH Mortg. Corp.,* No. 15-6122-NLH-KMW, 2016 WL 1389934, at *4 (D.N.J. Apr. 8, 2016). But, like the court in *Patel,* which specifically mentioned *Burroughs,* the Undersigned does not view *Alston* and the cases which follow it to be more persuasive than *Rothstein* and I do not believe the Eleventh Circuit would adopt the *"brief"* analysis of the filed-rate doctrine in *Alston* over the more-comprehensive analysis in *Rothstein*.

Plaintiffs' claims here against the insurance carrier and the loan servicer, or whether there are circumstances which would render the doctrine inapplicable here for some reason.

_**The filed-rate doctrine bars Plaintiffs' claims**_:   Like this case, in _Rothstein_, the plaintiffs alleged "they were fraudulently overbilled because the rates they were charged" by their mortgage servicer as reimbursement for LPI "did not reflect secret rebates and kickbacks that [the servicer] received from [the insurer.]"  794 F.3d at 259. The Second Circuit held that the claims implicated the filed-rate doctrine because "whether insurer-provided services should have been reflected in the calculation of LPI is not for us to say; under the nonjusticiability principle, the question is reserved exclusively to the regulators."  _Id_. at 263 (citation omitted).

_Rothstein_ concluded that the "overbilling" claims effectively required the Court to determine the reasonableness of the approved rates, thereby violating the nonjusticiability strand.  _Id_. at 262-63.  Likewise, Plaintiffs' demand here for return of the alleged "kickbacks" _included_ in their LPI premiums asks this Court to determine the reasonableness of ASIC's LPI rates and whether the alleged "kickbacks" should have been part of the authorized rate.  As in _Rothstein_, adjudicating that claim would violate the nonjusticiability principle.  _See also Hill_, 364 F.3d at 1317 ("Were we to award Hill the relief she seeks, we would be retroactively determining that the [charge] originally levied by Bellsouth . . . filed with and approved by the FCC, was unreasonable.").

*Rothstein* also held that any damages awarded to plaintiffs "would operate like a rebate to give them a preference over other borrowers who were charged for LPI," thereby violating the nondiscrimination principle. 794 F.3d at 263; *Hill*, 364 F.3d at 1316-17 (to permit plaintiff to recover BellSouth's undisclosed charges "would be to allow her 'to receive a discounted rate for phone service over other [BellSouth] customers'") (citations omitted). *Rothstein* and *Hill* dismissed "overcharge" claims because such claims violate both the nonjusticiability and nondiscrimination principles. *Rothstein*, 794 F.3d at 263, 266; *Hill*, 364 F.3d at 1317.

The *Trevathan* Court also followed *Rothstein*. The Plaintiff in *Trevathan* alleged that defendants charged "inflated" LPI premiums to borrowers whose loans they serviced or owned. 142 F. Supp. 3d at 1286, 1288. Like the plaintiffs here, Trevathan alleged that the defendants "failed to disclose to him that the premium included 'unearned kick-backs'" to the servicer. *Id*. Also like the plaintiffs here, Trevathan "argue[d] that it is not the rate itself, but rather the 'kickback' present in the inflated rate and the Defendants' alleged 'collusion and self-dealing' that is at issue." *Id*. at 1288. The *Trevathan* Court found those arguments "unavailing." *Id*. It explained:

> In *Rothstein* . . . the plaintiff alleged that, while he was charged the "filed rate," the loan servicer itself paid a lower rate to the insurer, benefitting from secret "rebates" and "kickbacks." The Second Circuit held that the filed-rate doctrine applied regardless, even though an intermediary had passed along the rate. The Second Circuit explained that to hold otherwise would violate the nondiscrimination and nonjusticiability principles that the filed-rate doctrine seeks to promote. As in *Rothstein*, the Plaintiff in

> this action was charged by the servicer for the insurance at the rate filed
> with regulators.

*Id*. (internal notes and citations omitted). *Trevathan* dismissed all "inflated premium"

claims with prejudice on the basis of the filed-rate doctrine. *Id*. at 1292.[15]

This Court also followed *Rothstein* in *Patel*, where the plaintiffs, in a complaint

filed on the same day and materially identical to the operative complaint here, asserted

that SLS, the servicer, "in collaboration with ASIC," charged borrowers inflated LPI

premiums because the premiums included "'kickbacks' in the form of unearned

commissions and expense reimbursements, 'illusory reinsurance,' and discounted

mortgage servicing functions." 2016 WL 1663827, at *1. Plaintiffs alleged that "SLS did

not pass these savings on to the borrowers, and therefore . . . they were improperly

charged more than SLS actually paid to secure the lenders' interest in the property." *Id*.

Exactly like the Complaint at hand, the *Patel* Complaint alleged claims against

ASIC for unjust enrichment, tortious interference with a business relationship, and

federal RICO claims. *Id*.  The *Patel* Court dismissed the claims, concluding as follows:

> Like Judge Dimitrouleas, the Court instead adopts the rationale of
> *Rothstein* and holds that the filed-rate doctrine bars Plaintiffs' claims
> arising from [LPI] excess premiums because the rates charged were
> approved by OIR.  The reasonableness of the commissions,

---

[15]    Plaintiffs contend that *Trevathan* is subject to challenge because the plaintiff's
attorneys were not familiar with LPI cases and devoted only less than one page to
responding to the filed-rate doctrine asserted in the dismissal motion.  This argument
might render the case slightly less persuasive, but it does not, in the Undersigned's
view, make the case *inapplicable*.

reimbursements, reinsurance costs, and services calculated into those rates
is a question reserved for the regulators.

*Id.*, at *4.[16]

*Rothstein, Trevathan* and *Patel* counsel dismissal of all claims. Plaintiffs do not

dispute that ASIC's LPI rates are regulated by the relevant states, and they were

charged the exact LPI premiums required by ASIC's authorized rates. Plaintiffs'

damages are allegedly being charged the components of their LPI premiums they call

"kickbacks." Plaintiffs' claims require this Court to parse out the portion of the

authorized LPI premiums that may be attributed to the alleged "kickbacks," and then

award that portion to plaintiffs as damages. That exercise would necessarily trespass on

the regulators' authority to determine ASIC's LPI rates and the components thereof,

violating the nonjusticiability principle. Such damages would also have the effect of

retroactively reducing plaintiffs' LPI premiums over other ASIC insureds, violating the

---

[16]     Plaintiffs try to distinguish *Patel*, a case their counsel filed and argued in the
opposition to the two dismissal motions, on the ground that Judge Cohn did not hold
oral argument. The Undersigned is not even remotely convinced by that argument.
First, it appears that Plaintiffs never requested oral argument in *Patel*. Second, they filed
comprehensive memoranda (i.e., a 20-page opposition to the servicer's dismissal motion
and a separate 20-page opposition to the insurer's dismissal motion). [*See Patel et al v.
Specialized Loan Servicing LLC et al*, Case No. 15—cv-62600, ECF Nos. 26; 27 (S.D. Fla.)].
Plaintiffs here have not suggested that their memoranda there were deficient,
inadequate or otherwise problematic. To the contrary, the submissions in *Patel* were, as
here, well-written, amply-researched and completely professional. Under Plaintiffs'
apparent view, any opinion, whether from a trial court or an appellate court, would be
somehow unpersuasive if the ruling had not been preceded by oral argument. The
Undersigned is not prepared to entertain such an extreme view.

nondiscrimination principle.  *See Hill*, 364 F.3d at 1316-17 (quoting *Taffet*, 967 F.2d at 1491). [17]

   ***Plaintiffs' claims challenge the filed rates:***   Plaintiffs argue that ASIC's rate filings have "nothing to do" with this case and they do not challenge the filed rate. [ECF No. 74, pp. 17-18]. Similarly, in their opposition memorandum, they contend the filed-rate doctrine does not apply because they purportedly are challenging only Defendants' "allegedly  wrongful conduct . . . ," not the rates themselves. [ECF No. 47, at p. 5].

   But *Rothstein* "rejected that [same] argument, explaining that even where the challenge is framed as a challenge to conduct, the claims 'rest on the premise that the rates approved by regulators were too high.'" *Lyons*, 2016 WL 415165, at *12 (*quoting Rothstein*, 794 F.3d at 263). "[A] claim is barred if an award of damages to the plaintiff would result in judicial [determination of] reasonableness of the rate even if the claim does not directly attack the filed rate." *Trevathan*, 2015 WL 6913144, at *2.

   The same is true here. Plaintiffs' proposed distinction is purely semantical. At bottom, all of their "kickback scheme" claims are premised on the allegation that the LPI premiums were "inflated" or excessive. [ECF No. 1, ¶¶ 23, 35, 45, 103, 111]. Hence, all of Plaintiffs' claims are barred by the filed-rate doctrine regardless of how they attempt to frame them here.

---

[17]      The Undersigned does not find pre-*Rothstein* cases from the Southern District of Florida to be particularly enlightening, especially because some of them relied on the *Rothstein* district court's decision, which the Second Circuit overruled. *See e.g., Wilson v. EverBank, N.A.*, 77 F.Supp.3d 1202, 1234 (S.D. Fla. 2015).

Beyond that, Plaintiffs' argument that they are challenging alleged "kickbacks" that are "never part of the filed rates" appears nowhere in the CAC. Indeed, the CAC repeatedly alleges that Plaintiffs' LPI charges were "inflated" because they included alleged "kickbacks." [*See, e.g.*, ECF No. 1, ¶¶ 6, 25, 26, 31, 32, 34, 35, 37].

The CAC seeks damages exactly equal to the components of their LPI premiums which Plaintiffs attribute to the alleged "kickbacks." The allegations of the CAC control, not counsel's arguments. *See Burgess v. Religious Tech. Cntr., Inc.*, 600 F. App'x 657 (11th Cir. 2015); *Kuhn v. Thompson*, 304 F. Supp. 2d 1313, 1321 (M.D. Ala. 2004).

Moreover, at the May 16 hearing, Plaintiffs' counsel admitted he could not calculate damages "without determining the amount of the commissions, tracking expenses, or other allegedly inflated, or unearned portions of the LPI premium[.]" [ECF No. 74, p. 105]. Claims that consumer charges included in filed rates are "excessive" are the classic claims barred by the filed-rate doctrine. *See, e.g., Rothstein*, 794 F.3d at 261-66; *Taffet*, 967 F.2d at 1485-86; *Patel*, 2016 WL 1663827, at *1-4; *Trevathan*, 142 F. Supp. 3d at 1287-88; *Uniforce*, 892 F. Supp. at 1512.

In addition, as the Eleventh Circuit has cautioned, "even if a claim does not directly attack the filed rate, an award of damages to the customer that would, in effect, result in a judicial determination of the reasonableness of that rate is prohibited under the filed rate doctrine." *Hill*, 364 F.3d at 1317.  Here, Plaintiffs' theory would require the Court to determine that components of the LPI rates charged to plaintiffs, such as

commissions and tracking or other "unearned" components, were improper and should be returned to the plaintiffs, thereby necessarily deciding that the rates approved by the insurance regulators were unreasonable. That "is prohibited under the filed rate doctrine." *Id.*

Moreover, if the Court ordered a refund of portions of the authorized LPI premiums to plaintiffs, then they would effectively pay a lower premium than other LPI insureds of ASIC who are not represented in this case, thereby violating the nondiscrimination principle.[18]

*Taffet*, *Hill*, *Rothstein*, *Patel* and the allegations of the CAC require this Court to reject Plaintiffs' argument that the filed rates are not central to their claims.  It is the nature of the relief being sought, and the implications of awarding that relief for the

---

[18]    At the May 16 hearing, Plaintiffs argued that the nondiscrimination principle would not be violated because all individuals whose mortgages and loans were serviced by Caliber are at issue. This argument was rejected in *Wegoland*, 27 F.3d at 22 ("Because most of the animating policies behind the filed rate doctrine are not diminished in the class action context, we hold that the filed rate doctrine applies whether or not plaintiffs are suing for a class.") and *Taffet*, 967 F.2d at 1492 (application of the filed-rate doctrine forecloses "strike suits that would be brought as eager lawyers, using the class action vehicle, circumvent the states' rate-making mechanisms—all at the expense of the consumers").

In addition, Plaintiffs conceded that ASIC had only one set of filed rates which were applied to all its LPI insureds regardless of the servicer. [ECF No. 74, p. 17]. A refund to Caliber's customers would effectively order a lower LPI rate for ASIC's insureds who were Caliber customers than for customers of other servicers.  Plaintiffs' further argument that ASIC allegedly paid different amounts to different servicers under separate out-sourcing contracts [*id.*, at pp. 17-23, 86-87] is irrelevant because those amounts were not components of the LPI rates and are not at issue here.

regulatory process, which triggers application of the filed-rate doctrine. *Taffet*, 967 F.2d at 1495; *Rothstein*, 794 F.3d at 263; *Roberts v. Wells Fargo Bank, N.A.*, 2013 WL 1233268, *13, n.9 (S.D. Ga. Mar. 27, 2013) ("Regardless of the spin put on Roberts's allegations and claims, at bottom this case calls for relief that itself triggers application of the filed rate doctrine.").

Here, the damages Plaintiffs seek are measured by the portions of their LPI premiums they attribute to alleged "kickbacks."[19] Assessing and awarding that relief would subvert the regulators' authority to decide which expense components should be included in a reasonable LPI rate and discriminate between ASIC's LPI customers.  The filed rate is central to Plaintiffs' claims and the CAC challenges the filed rate.

***Plaintiffs are "rate-payers"*:** Plaintiffs argue that they are not "rate-payers" because Caliber initially pays for LPI and passes along the LPI charges to plaintiffs.  Plaintiffs offer no coherent factual or legal support for their position. The CAC throughout alleges that Plaintiffs and putative class members were charged or paid for

---

[19]     Challenging components "that make up a portion of the premium . . . is challenging . . . [the] insurance premiums, . . . , and thus [the plaintiffs'] claims are barred by the filed rate doctrine."  *Roussin v. AARP, Inc.*, 664 F. Supp. 2d 412, 417 (S.D.N.Y. 2009), *aff'd*, 379 F. App'x 30 (2d Cir. 2010); *Uniforce Temporary Personnel, Inc. v. National Council on Compensation Insurance, Inc.*, 892 F. Supp. 1503, 1512 S.D. Fla. 1995) (applying doctrine to dismiss antitrust claims); *Decambaliza v. QBE Holdings*, Inc., No. 13-cv-286, 2013 WL 5777294, at *6-7 (W.D. Wisc. Oct. 25, 2013) (plaintiffs' "attempt[] to characterize [their] claims as a challenge to improper and unlawful insurance practices and not to the reasonableness of the filed rate" is "an illusory distinction").

LPI coverage.[20] The CAC avoids the word "premium" and instead uses "charge" to describe amounts charged for LPI, but semantics do not change the fact that **Plaintiffs were in fact charged the very LPI premiums.** Plaintiffs' mortgages expressly permit their lenders to "obtain insurance coverage, at . . . Borrower's expense." [ECF No. 1, ¶¶ 48, 64, 77]. As *Rothstein* explains:

> The purpose of LPI is to enforce the borrower's contractual obligation to maintain adequate hazard insurance; the lender acts on the borrower's behalf and in the borrower's place to 'force place' a transaction that the borrower should have entered. There are three participants in the transaction (insurer, lender, borrower), but the lender is a go-between that connects the insurer (the party selling insurance) to the borrower (the party actually paying for it). Thus LPI is an A–to–B–to–C transaction that implements a two-party transaction between the insurer and the borrower.

794 F.3d at 265 (internal citations and footnotes omitted).

Furthermore, the certificates of insurance issued to Plaintiffs, which were approved by the regulators, expressly state that "the lender is authorized to advance all funds to be recovered from the borrower for the insurance afforded[.]" [ECF Nos. 74, p. 51; 23-1 Ex. 3, p. 34 of 101 (Fowler); 23-3, Ex. 3, p. 33 of 62 (Keller).[21] And as Plaintiffs

---

[20]   *See*, *e.g.*, ECF No. 1, ¶¶ 2, 3, 5, 6, 12, 25, 26, 31, 34, 35, 45, 46, 123, 125, 131, 133, 150; *see also* ECF No. 74, p. 105 (Plaintiffs admit they cannot calculate damages without determining the allegedly inflated, or unearned portions of the LPI premium).

[21]   Plaintiff Yambo-Gonzalez's LPI policies name her as an "Additional Insured." [ECF No. 23-2, pp. 30, 50, 68, 88, 104, 124, 140].

admit, the OIR's website expressly states that homeowners may be responsible for paying the LPI rates.  [ECF No. 74, pp. 47-48, 50].

Plaintiffs attempt to avoid the obvious conclusion that they are rate-payers by arguing that there are two separate transactions -- first between ASIC and Caliber, and then between Caliber and the borrowers. But this argument ignores the express terms of their mortgages, which expressly authorize the purchase of LPI at plaintiffs' expense. [ECF No. 1, ¶¶ 48, 64, 77]. And Plaintiffs' purported distinction was explicitly rejected in *Rothstein, Patel*, and *Trevathan*.[22]

---

[22]    Plaintiffs' argument that LPI is a "'commercial' lines insurance, covering businesses, as opposed to 'personal lines' insurance, covering individual consumers," was rejected in *Lyons.* The *Lyons* Court found this argument to be "merely a recapitulation" of the argument that the filed-rate doctrine does not apply, and reiterated that it could not examine the amount charged for reimbursement to plaintiffs without considering the reasonableness of the filed rate -- an exercise that would violate the nonjusticiability principle. 2016 WL 415165, at *13. *Lyons'* reasoning is persuasive. *Lyons* involved lender-placed hazard insurance, the type of coverage at issue here, but other district courts in the Second Circuit have also applied the analysis to lender-placed flood insurance. *Clarizia v. Ocwen Financial Corp.,* No. 1:13-cv-2907, 2016 WL 439018, at *3 (S.D.N.Y. February 2, 2016) (rejecting Plaintiffs' four arguments designed to avoid *Rothstein* and noting that the distinction between "consumer lines" insurance" and "commercial lines" insurance is "a distinction without a difference" because, "regardless of the type of insurance, the Court must apply the filed rate doctrine and bar the claims").

**Conclusion**

Because the Undersigned predicts that the Eleventh Circuit would apply the filed-rate doctrine to this LPI class action case, I **grant** Defendants' motions to dismiss and **dismiss with prejudice** the Complaint.

**DONE AND ORDERED** in Chambers, in Miami, Florida, July 8, 2016.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:
All counsel of record

45